If I may, I'd like to start with a decision that was entered by this Court a little bit after the briefs were filed, Barrow v. Chase Bank, although I do say with a little bit of difficulty in Judge Graber's involvement in that decision. We believe that Graber is exactly on point as to at least two of the elements of plaintiff's claims, and that perhaps the District Court, with the assistance of the Court's guidance in Barrow as well as the Court's guidance in Hawk, may have come to a different decision at the lower court level. But the main opinion in Barrow finds that a reservation of rights clause in fine print approximately five pages after the disclosure of the APR is too far removed to be clear and conspicuous under the TILA guidelines and regulations. In this particular instance, depending on whether you look at the offer or whether you look at the subsequently mailed terms and conditions, the reservation of rights clause was in fine print 15 paragraphs after the APR disclosure, and actually three physical pieces of paper after the APR disclosure. Whereas the APR disclosure in no less than six places in bold print stated that the APR would be fixed, first on the initial offer page, then on the consumer box, then also on an additional letter that was enclosed regarding balance transfers associated with the offer that was made. A reasonable consumer looking at that offer would not think that 15 paragraphs into fine print, something would say this fixed APR that we're offering you is actually subject to change at our whim for any reason or no reason whatsoever just because we feel like it and we can't, which is essentially what that reservation of rights clause means. Rather, they would look at the print that was stating what the APR was and look at the bold type underneath, which provided three discrete reasons, none of which are applicable here, where an APR would be increased. Those reasons included things like default, included things where the person's credit history had not panned out according to what was at the time the offer was made. But nowhere in there does it say, in addition to those three reasons, we can change it whenever we want for whatever reason we want. Yeah, you're looking at the excerpt of record four at 232 through 237. Yeah, okay. Right. But, all right. I have it here. So given the fact that this fine print reservations of rights clause is located so far from any reasonable consumer's view of where they would find APR information, we believe that the decision of the court in Behrer is right on point in terms of our complaint alleging the value violation. Where is that now? Is it on 237? It's at 237, Your Honor, about three-quarters of the way down the page on the right-hand column. On the right-hand. Is that in terms of the offer? Underneath the terms of the offer. And it's on the right-hand column? Correct, Your Honor. How many asterisks down? I apologize, Your Honor. I don't have it right in front of me, but it's about five to seven asterisks down, I believe. What does it say? It says that the terms of the agreement are subject to change, including rate and fees, I believe. On 237. Okay. Further, as Jeff Graver noted in her dissenting opinion in Behrer, where an event is clearly foreseeable, a general reservation of rights is insufficient. In this instance, although we don't have quite the same egregious facts as in Behrer in terms of the plaintiff in Behrer alleged that Chase already knew of the events in Plaintiff's record in that case that would give rise to a increase in rates, what we do have is the repeated word of the word of the use of the word fixed in at least six different bold-faced places across the complaint. When it's very clear. You said across the complaint. I'm sorry, across the offer. Something else. I apologize. I didn't say it. When it was very clear that at the same time, and as appellees and defendants admit in their briefs, Chapter 1 continuously held the belief that it was not a fixed rate, that it could, in fact, be changed upon when. Well, doesn't fixed just distinguish itself from variable, as in a fixed rate mortgage or a variable rate mortgage? That would be true, Your Honor. But in the same sense, a fixed rate mortgage does not give the lender the right during the term period of the mortgage to change that fixed rate. No, I just wonder how far you're trying to take the argument relying on fixed. In the next page, in very large print, it says fixed just means for now, and we will have the opportunity to change this given changing market conditions or whatever. Would you be putting so much weight on the word fixed? I just don't know how much it would bear. Actually, I agree. I think if on the next page or on the same page in bold print it said something along the lines of fixed doesn't mean it's fixed forever. Fixed means that we can change it whenever we want. It just means that it's not variable. Because that's a technical meaning. You're saying that's not necessarily what an average consumer would use. Exactly, Your Honor. Okay. If there was a prominent disclosure that said this is the technical meaning and this is what you should take from the word fixed, we wouldn't be here. We would be okay with the disclosure that was made. But no such meaning was disclosed and no such technical meaning was disclosed in any order, nor is there a technical meaning actually affixed to the word fixed in either TILA or Regulation Z covering great disclosures. In fact, Reg Z, particularly in the Schumer box, provides that no other language than that permitted by the Schumer box should be included, and one of the terms not included in the approved language is the word fixed. So even the inclusion of the word fixed in the Schumer box itself would constitute a technical violation of TILA. What significance is there to the offering questions and answers that describe the interest rate as the 6.99 fixed APR on all transferred balances made through this offer? Does that suggest to a reasonable consumer that the rate applies just to the transferred balances and not to things that happen once those balances have been paid off? It's a little difficult to tell from the way the items are photocopied, but that piece of paper was actually attached to a balance transfer request form. It was actually a separate piece of paper from the piece of paper on which the actual credit card offer was made. We don't think that that actually would have led a consumer to think that the credit card offer was not fixed either, because in the credit card offer itself it also used the word fixed over and over again, whether or not you ever took advantage of the balance transfer form. So you could do one without the other? Correct. You could take advantage of the credit card offer without having to do a balance transfer. I don't think you could do a balance transfer without taking advantage of the credit card offer. Well, that makes sense. Yeah. So given the Court's decision in Behrer and to some extent Judge Graber's defense in Behrer, we believe that under either situation the allegations of this complaint do form a violation of TILA. Going back one step, however, even if the Court should find that we did not actually create a violation of TILA, the Ninth Circuit's decision in Hough v. J.P. Morgan Bank, which was again entered after the District Court's decision but prior to the briefing of this matter, again would allow this Court to determine that there's no state harbor provision for purposes of a violation of California's unfair competition law simply because defendants did not manage to do a technical violation of TILA. In Hough, the Court specifically held that even though you could find that no specific TILA violation occurred, you could still have a violation of California's unfair competition law based on the reasonable consumer test and what a reasonable consumer would have believed or been misled by the terms of the offer. And especially given the fact, again focusing on the word fixed, that fixed was prominently disclosed all over the place in this offer, that at no point in time other than in fine print, paragraphs and paragraphs down into the fine print, did the defendant disclose that they had the right to change anything, including the rate at any time they felt like it, we believe that it would still constitute a violation of the unfair competition law even with the Court to find that the complaint did not fall within the parameters of a TILA violation. Do you want to save some time? Sure. I will save some time at this point. Good morning, Your Honor. I'm Jim McCabe for Appalooh Capital Law and Spanning. Let me first clarify a record point that Mr. Parrish raised here. The TILA disclosure here, in this case, is at ER 237. What do you call that disclosure? I'm sorry. It's TILA for Truth and Lending Act. The counsel is saying Truthful Lending Act. I'm sorry? Call it Truthful Lending Act, not Truthful Lending Act. Okay. And the technical term for that disclosure is the initial disclosure. And if the Court – this is a case unlike Parrish because in this case the disclosure is 237. It is not the preceding pages. And on the very face of this disclosure, the ability or the right to vary the terms of the contract, including the rates, is disclosed not 11 pages behind. What page are you looking at now? I'm at 237, Your Honor. Where are you looking? Right – you see the word Terms of Offer? Yeah. Second asterisk down on the right-hand side beneath that label. Why didn't you put it right up with the other reasons for changing the interest rate or terminating? Because, Your Honor, what – Because you did – you thought you didn't have to. Yes. We thought we did not have to. I don't – what does that say? I'm sorry. I will receive the Capital One – Customer Agreement. Customer Agreement. That's hard to read. I am bound by its terms and future revisions thereof. My agreement – Terms. Terms. For example, rates and fees are subject to change. Yes. Yeah, but aren't you supposed to put important things in that Schumer box? There's nothing in the Schumer box that tells the consumer that the bank can raise the rates for no reason at all. Well, Your Honor, there are limitations under Reg Z on what you can put in the Schumer box. And the fact that this fixed rate term has an indefinite duration is not an item that is permitted to be placed inside the Schumer box. It is permitted to be placed outside the Schumer box. Now, this is a case where you had an asterisk and then these conditions were placed outside the Schumer box. Correct. That's right. And this is a case – let me – let me – You could have placed this right in the list of things that would alter the terms. Yes, but I believe it would have been inconsistent with Reg Z. Reg Z requires disclosure of specific – the APR that may be imposed if specific events occur. And this is one of the topics at heart. So does it tell the consumer, go read Reg Z? No, no, no. No. What is – let me ask you about that. We agree with the appellant that this disclosure called for a fixed rate target. It did. But you're saying to us that because you can do it any time, you're not allowed to put it up above. That's what you're saying to me. What I'm saying is because there are not specific criteria for the interest rate to change to a particular amount, it cannot be included. Well, but that's not – it doesn't talk about particular amount. It talks about particular conditions under which a change will occur. Specific events. Which is different. Yes. Are you arguing that it would have been a violation of Regulation Z to have added an item that said, if market and economic conditions change, we also will alter the rate? Inside the box, yes. It would have. Well, you think that's a violation if that's in the list of things that will cause the rate to change? No, it is not. But the overarching point here is duration. We haven't heard from the appellant, from the plaintiff, how long a reasonable person would have understood the rate disclosed in this document to remain fixed. Well, you know, the people get these things like I get them almost every other day. Open them up. Cut that card and throw it away. And, you know, if you look at it, and what does it tell you? It tells you – where is all this stuff? You know. Maybe it's the other page. Well, the long and the short of it is that you don't want people to see that up front. No, no, that's not at all. It says right here, rate 6.9 fixed APR. Oh, this is on balance transfers and purchases. Credit line up to $20,000. So, you know, that tells me that that's the rate, 6.99. And it was the rate. It doesn't tell me, unless I wear my eyes out, that at any time that the bank wants to increase that rate. And, you know, there's a lot of stuff in here where people get sucked in. They find out later on if they're late making a payment. Boom, it goes up, right? And it stays that way. And then you want to get people to, you know, oh, you know, people are suffering. Consolidate all your credit card debts. Send them to us. We'll give you the 6.99 rate. And, you know, they're already trying to crawl out of a hole. And they say, God, you know, I'm paying 25%. I can do it for 6.99. So they bring all the money over there. Then they got a much bigger monthly payment, huh? You know, and they miss once. Boom, they're up there again. Your Honor, that's not a... I mean, you know, what's the difference between that and highway robbery? Well, Your Honor, it may be highway robbery, but that is not our case. It is not our case. This plaintiff... Well, let me ask you this. Just wait a minute. I want to ask you a couple questions. You have here on this page 233, you have been preselected. That means you're either a pigeon or a rich man. For this offer for a Capital One Platinum MasterCard featuring a low 6.99 fixed APR. You know, how many people do you think know what APR means? How many people know what that means? I don't know, Your Honor, but I'm afraid we're bound by what the Fed says. I know what the Fed says. Blame the Fed. APR on balance transfers and purchases. A credit line of up to $20,000 and no annual membership fee. This is not an introductory rate. You know, like the telephone companies, they say, Oh, you know, you can call the world for nickel, but this only lasts a month. Teaser. Teaser, that's what they call it. Or pay to switch or whatever it is. Teaser sounds better. Then it says, you'll also enjoy the security of zero fraud liability. If your card is ever lost or stolen, plus your choice of custom card design. In other words, you can get your picture on your card. Now, you say you'll enjoy the security of zero fraud liability. Yes, sir. Now, what if my credit card is stolen and somebody uses it? Am I liable for that? Up to $50. Come on. You know, up to $50. Up to $50. But if it's $50,000, you've got to pay it. Right. So why are you telling me this is such a great deal? Zero fraud liability. So you're saying the $50 you don't have to pay. Correct. Isn't that wonderful? Most people say, you know, all this advertisement is out there and people are just worried. Oh, you know, your identity fraud, all this and that. You got half scared of that. And people worry about credit cards. So it's only $50. Correct. But most people agree with it. It might lose their house. So you got all this stuff in there. So this whole thing is designed, you know, to suck people in. And it's supposed to be clear and conspicuous. Is that clear and conspicuous? Yes, it is. Boom. Well, let me explain. It is clear and conspicuous. Ms. Rubio got the 6.99% APR for three and a half years. And then she was told if she wanted to keep it, she could. And if she had kept it at that point, she had a balance of about $6,500. She could have borrowed some of that money for as much as 12 more years, a total of 15 years. That APR was fixed from the day she got her card until she said, until she agreed that that APR could be changed because she wanted to keep on charging new money. What Capital One said to her in 2007 was, We're not going to lend you any more money, but you owe us this money. We told you it would be $6.99. You can keep it at $6.99. You don't have to pay it off right away. You can make only your minimum payments. Godspeed. It's your choice. You can choose to keep the $6.99 we promised you or not. Yeah, but if you miss a payment, it's going to go up to, what, 25%? No, no. But that's disclosing the T-Mobile box. That's right there in the T-Mobile box. It's the second line. Or the second part of the table says Other APRs. And it's right there. Well, I'm sure you got your skirts covered here and there. I want to get a little better understanding. At the end, she could cancel the card. Yes. Pay off the balance right then, isn't it? She could. Oh, yeah, she could, yeah. She could, but she's not obligated to. But does not the interest rate increase on the balance if she? If she elected, as she did, the offer made to her was, You have $6.99, you can keep it. But we're not going to lend you any more money at $6.99. And you can keep paying an offer as quickly or as slowly as you like, consistent with the terms of your agreement. Well, she would only have to make the minimum payment each month? Yes, yes. And pay the 6.99%? Yes, oh, yeah. She had that right. And as I said before, if that was what her election was, and she paid only the minimum payment, she would have enjoyed some extension of credit for about 12 years. I mean, making the minimum payment is a mistake, quite frankly. But it is low enough so that she can make the payment and won't trigger the follow-through. But they could have raised the rate at any time. They could have. Yeah. But they didn't. They didn't raise it at any time. They could have. They could have raised it to $12.99. They could have raised it. That's not Capital One's contention, not on these facts. Well, if you read this agreement, they could have done it. The legal obligation, from our perspective, the legal obligation that's created here is that because no duration is specified, it doesn't say how long they have to keep the fixed rate APR open. Because no duration is specified in any of the materials, Capital One is obligated to offer that rate and to hold that rate constant for a reasonable period of time. And this is exactly the – this is really the same reasoning in the Rossman case and the Third Circuit. That was about a statement that there was no annual fee. Five months later, the bank changed the terms, using one of these changing terms provisions, and imposed an annual fee. And the court held that because a reasonable consumer would think that that means at least no annual fee for one year, that changing it within five months was too quick. In this case, and whether you look at California law or Virginia law, the implied term here is that the $6.99 has to be available for a reasonable time. And the credit privileges were available for three and a half years. The rate was available for up to 15 years, the three and a half that she got and the 12 that she could have taken. That's a reasonable – it is a reasonable amount of time to allow her to charge new charges at $6.99 for three and a half years. Now, TILA does not supply substantive terms of the contract. It is exclusively a disclosures statute. And so the substantive term, how long must this contract go on, is a question of state law. And in this case, it would be a common law. And it is, I think, at least in the area of contracts, common law reflects an expectation of what ordinary people would agree to when they exchange agreements when they haven't been explicit about something that is important, like the duration of the contract. I think here, three and a half years as a period in which fixed purchase rates is available is manifestly a reasonable amount of time. So Capital One had the right and had it explicitly under the cardholder agreement and had it implicitly a common law if the promotional materials constituted the agreement. They had the right to terminate this contract at the time that they offered her a new deal with the alternatives being that they would terminate the contract. They had the right at that time. You're a great salesman. I have a credit card for you, sir. I already got one. But I pay it off in full every month. That's wise. That's wise. But now I'm getting nervous. So I'm afraid I'm down to a minute. No, you're over by a minute. Oh, I'm sorry. It's counting uphill. Thank you. Okay. I'm sorry if you have any questions. No. It restored my faith. Thank you. Although the defendant is correct that she had the option if she chose to cancel her credit card of keeping the rate on her balance transfer, as Judge Ferguson pointed out, it didn't say that you would get to keep that balance rate forever either. It said that rate was subject to change. Although the material I read earlier from the solicitation on the balance did suggest that the transferred balance would be at that rate. The transferred balance would be. But in this particular instance, this is what this bill is. It wasn't a transferred balance. It wasn't a transferred balance. It was a charged balance. And that charged balance could vary at will. The second point is that Capital One seems to believe that closing your credit card doesn't mean anything to you. But the reality is it does. Closing your credit card affects your credit rating significantly. It impacts the amount of available credit that you have versus the amount of credit that you've used. It affects how your credit rating is rated by the ratings agencies. And actually terminating a credit card and closing it out while keeping a balance open could result in other cards that you have or other loans that you have having provisions triggered in them which would increase their rates automatically. What is your view of what the contract requires or permits for cancellation of the card or termination of the agreement on the part of the issuer? If the issuer terminates the agreement on its own for reasons that it believes are necessary as stated in the contract, then that's one issue. But here the issue is. Well, let me. That was kind of an open-ended question. But I guess what I'm getting at in my own mind is something more specific. Is the issuer of the card entitled to terminate the card relationship not for wrongdoing but just because of what it perceives to be business reasons? The issuer has certainly reserved that right in its contract. Okay. In its terms and conditions. And it's done so in a sufficiently conspicuous way. We would argue that it has not. Okay. Because it's in the same location as the other change in terms of. Because what I'm wondering is just as a practical matter, if for generic business reasons a company wants to raise the rates, and the economy is lousy and they're losing money and everybody's in a mess and we need to raise our rates, having nothing to do with any particular individual, I'm wondering if theoretically they can't simply start over and say we're terminating everybody's relationship and tomorrow if you want to continue to do business with us we're going to raise the rates. I mean, technically it would be a new contract as distinct from an alteration of the existing contract, but it would have the same result with a lot more paperwork. I think there are two questions sort of implicit in that. One is would they do it for business reasons? One of the things that credit card companies try and do is keep their customers. I mean, as Judge Preggers noted, people get solicitations for credit cards in the mail over and over and over and over again all the time. I certainly do as well. And if they want to keep their customers at the higher rate that they want to impose, they don't want to say. They're not likely to do it, but theoretically in terms of what their rights are, they can figure out a way to get that higher rate. Theoretically they probably could figure out a way to get that higher rate, but they would risk a much higher substantial loss of business from people who they currently have as customers who they would have to solicit all over again to become new customers if they were going to do that. What Capital One did was want to keep all of their customers that they already had, but then give them a Hobson's choice of either I cancel my credit card voluntarily with you and impact negatively my credit rating, or I have to accept your higher interest rate on the balances that I've already charged. You couldn't do, I mean, they had another option, which was to say on the balances that you've already charged, we're going to keep your 6.99% rate. On future charges going forward, we're going to increase your rate to 15% or 16% or something like that, and we will let you keep your credit line open so that it doesn't negatively impact your credit rating. They didn't do that. What they did was made sure that people who already had balances on their cards. Why are they required to do that third choice? I understand why it's beneficial to you, but going back to what's in the complaint, what legal obligation did they have by reason of this contract or by reason of federal law that they had to offer that third choice? I would argue that they didn't have to offer that third choice. In fact, they didn't have the right to offer the choice that they did either. Neither of those choices would technically, we would argue, were technical violations of TILA. However, the issue is would our client have images had they offered that third choice? And one of the items that they argued in the court below was that our client doesn't have the images. And the court below accepted that by saying that if our client just closed the credit card, there would have been no harm, no foul because they had the 6.99% rate going forward. Is there evidence in the record that the voluntary closing of an account by itself is a negatively reported credit event? That's alleged in the complaint. This is at the motion to dismiss stage. Okay. So that's the best I can tell you on that. So we have to accept that as true for purposes of this. Correct. The voluntary closure of one's credit card, so if I get disgusted with credit card company X and I close my account and open a different one, that's going to be a negative on my credit history. It can be depending on what your overall credit profile is. And it's certainly, we've done an analysis of, it's not in the record, but we have done an analysis in this Rubio's case, we believe that it would be a negative on the credit profile. You're over your time. Thank you. Okay. Matter is submitted.
judges: Fletcher B. , Pregerson, Graber